## AFFIDAVIT

I, Wade Cochran, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Task Force Officer with the Federal Bureau of Investigation ("FBI") and have been since November 20, 2019. In such capacity, I am authorized to investigate violations of the United States Code under Title 18 and Title 21, to include applying for search warrants before the United States District Court. I am employed by the Montpelier Police Department, and am currently assigned to the Detective Division. I was previously assigned to the Vermont Drug Task Force for over five years, from December 2013 to January 2019, and have been a Full Time Law Enforcement Officer since 2004. I have authored numerous search warrants and participated in hundreds of criminal investigations, many of which involved violations of state and federal controlled substance and firearm laws.

2. I submit this affidavit in support of an application to search 81 Berlin Street, Apartment 1, Montpelier, Vermont (hereinafter "Subject Premises"), as well as a separate application to search a black 2015 Honda Pilot, Vermont registration HBP925, registered to Jennifer Harwood, 157 State Street, Apartment 11, Montpelier, Vermont, with VIN 5FNYF4H44FB053391 (hereinafter "Subject Vehicle"). The Subject Premises is described and depicted more fully in Attachment A-1 and the Subject Vehicle is described and depicted more fully in Attachment A-2. The request for a search warrant is for evidence relating to conspiracy to distribute and distribution of cocaine base, a Schedule II controlled substance, and heroin, a Schedule I controlled substance, in violation of 21 U.S.C. §§ 846 and 841(a)(1). The items to be seized are listed in Attachments B-1 and B-2.

3. Based on the facts set forth in this affidavit, I submit that there is probable cause to believe that ADAM SALDI is involved in the knowing and intentional distribution of cocaine base and heroin, in violation of 21 U.S.C. § 841(a)(1), and conspiring together with others known and unknown to distribute cocaine base and heroin, in violation of 21 U.S.C. § 846. I also submit that there is probable cause to believe that the Subject Premises and the Subject Vehicle contain evidence of these criminal offenses; that the Subject Premises and the Subject Vehicle contain contraband and fruits of these crimes; and that the Subject Premises and the Subject Vehicle contain or are property designed for use, intended for use, or that have been used in committing these crimes.

4. The facts in this affidavit come from my training and experience, and investigation, as well as information that has been conveyed to me by other members of law enforcement. This affidavit is intended to demonstrate that there is probable cause for the requested warrants and does not set forth all facts known to law enforcement about the matter.

## PROBABLE CAUSE

5. In April of 2020, the Montpelier Police Department started an investigation into ADAM SALDI concerning the distribution of cocaine base and heroin in the Washington County

area.[1]  The investigation involves a cooperating individual (hereinafter "Yellow"),[2] who is assisting the Montpelier Police Department.

6.  On or about April 9, 2020, I conducted surveillance at the Subject Premises. At approximately 3:00 p.m., I observed two individuals I identified as Harvey Caroll and Amanda Bellville. I know Amanda Bellville from prior drug activity. Bellville went into the Subject Premises and came out a short time later with two black males. The males were carrying luggage that they put in the back of Caroll's vehicle. The vehicle then traveled west on Berlin Street and out of my sight. On that same day, I also twice observed SALDI driving the Subject Vehicle.

7.  On or about April 16, 2020, I spoke to Yellow, who recalled events from on or about April 3, 2020 regarding SALDI. Yellow stated that she/he was concerned about SALDI at that time, as she/he had not heard from him much. Yellow further stated that she/he has known SALDI for many years and knows that he has had an addiction to narcotics in the past and has been arrested and has served time for narcotics. As Yellow stated, on or about April 3, 2020, Yellow went to the Subject Premises, an apartment which SALDI rents. Yellow walked into the apartment and saw what appeared to be a large amount of cocaine base or heroin on the table.

---

[1]  A review of SALDI's criminal history indicates that, among other criminal convictions, in Washington County District Court, on February 10, 2017 he was convicted of cocaine possession <2.5 gm, a misdemeanor, and that in the United States District Court for the District of Vermont, on June 29, 2009, he was convicted of being a felon in possession of a firearm, a felony.

[2]  A review of Yellow's criminal history indicates that, in Vermont, from 1995 through 2016, Yellow incurred multiple misdemeanor convictions, including for assault in 2016, passing a bad check in 2013, 2007, and 1996, and for providing false information to an officer in 1995.

Yellow observed multiple people in the room, who appeared to be putting the suspected narcotics in small plastic bags and weighing the suspected narcotics. Yellow stated that there were two light-skinned African American males at the table, two females, and SALDI. Yellow stated that she/he watched for five to seven minutes then called SALDI's name and ran down the stairs.

8. When I spoke to Yellow on or about April 16, 2020, Yellow also recalled events from on or about April 15, 2020, at approximately 2:00 p.m. Yellow stated that she/he witnessed Harvey Caroll leaving the Subject Premises. Yellow followed Caroll to Barre City. When Yellow pulled up beside of Caroll, Caroll rolled down his window and Yellow asked Caroll why he was at the SALDI's apartment (the Subject Premises). According to Yellow, Caroll stated that he was picking up a prescription for a friend. Yellow asked Caroll if he was sure it was not drugs. Caroll then left. Yellow further stated that she/he has witnessed a lot of traffic in and out of the Subject Premises, specifically short duration stops.

9. During April 2020, the Montpelier Police Department received multiple complaints about traffic and short duration stops at the Subject Premises. Some of the complaints came from other residents of the building. Additional complaints came from the landlord.

10. Also on or about April 16, 2020, a surveillance team and I conducted surveillance on the Subject Premises. At approximately 4:40 p.m., I observed a blue Subaru, bearing Vermont registration number HSP700 leave the Subject Premises with two males and one female in the vehicle and headed toward Northfield Vermont. The vehicle was only at the Subject Premises for a short period of time. I learned from a Department of Motor Vehicles database query that the vehicle was registered to Jessica Roggensack. I was familiar with Ms. Roggensack because her name had come up in a number of investigations during my time on the Drug Task

Force. While I did not have direct drug purchases into Ms. Roggensack, she had been identified by several CIs as a dealer and/or heavy drug user.

11. At approximately 5:07 p.m. on or about April 16, 2020, a member of the surveillance team saw SALDI come out of the Subject Premises and get into the Subject Vehicle. SALDI appeared to be the driver and sole occupant of the Subject Vehicle. The surveillance team followed SALDI around Montpelier and observed two men walk up to SALDI at an intersection and have a brief interaction with SALDI through the window of the Subject Vehicle, after which the two men left quickly. The surveillance team also observed SALDI travel down State Street but lost sight of him.

12. Later on or about April 16, 2020, I found SALDI at the Montpelier Park and Ride in the vicinity of Dog River Road. I also saw the Subject Vehicle at the Park and Ride at that time. At approximately 6:46 p.m., I observed SALDI leaning in the passenger side of a red Nissan Pathfinder, bearing Vermont registration HPD567, and then return to the Subject Vehicle. I called Sergeant Kevin Moulton to approach this vehicle. Meanwhile, the surveillance team followed SALDI to Northfield, Vermont, where they observed SALDI driving down a dead-end road to an apartment complex. SALDI was there a short period before leaving and traveling back to Montpelier in the Subject Vehicle. SALDI went to the Shaw's supermarket on Main Street in Montpelier, where surveillance teams monitored the Subject Vehicle.

13. Sergeant Moulton and Officer Amos Gaylord of the Montpelier Police Department arrived at the Montpelier Park and Ride. Sergeant Moulton observed the red Nissan Pathfinder, bearing Vermont registration HPD567, and further observed that it was occupied by two people. Sergeant Moulton asked Officer Gaylord to park as to not block the red Nissan Pathfinder from freely leaving. No emergency lighting or sirens were used. Sergeant Moulton

approached the Pathfinder on the passenger side. When he got close to the vehicle, the passenger (later identified as Andrew Kenney) appeared startled by his presence. Kenney opened the door and asked Sergeant Moulton what was up. Sergeant Moulton asked if they were ok and what they were doing there. The male in the driver seat (later identified as Ryan Tomasi) stated they were waiting for a ride. Sergeant Moulton asked Tomasi if he was not permitted to drive and he claimed he was not driving. Sergeant Moulton asked if Tomasi had a license and Tomasi stated that he did not. Tomasi claimed he did not drive there and that he was simply waiting for the vehicle owner to arrive and drive them out of there. Tomasi further claimed that the owner of the Pathfinder was out on a date with his girlfriend, which seemed odd to Sergeant Moulton as area establishments were closed due to COVID-19. Sergeant Moulton has had multiple professional involvements with Kenney and knows that Kenney has multiple drug-related convictions.[3]

14. Sergeant Moulton observed that while speaking with Tomasi and Kenney that they both appeared to be nervous. Kenney would not look Sergeant Moulton in the eye and Tomasi's hand were shaking. Sergeant Moulton advised Tomasi of his observation and Tomasi stated that he did not like cops and that was why he was shaking. Sergeant Moulton asked them if there were any drugs in the vehicle. Tomasi claimed it was not his car so he did not know. Sergeant Moulton advised that the Park and Ride is a common place for drugs to be used and/or bought and sold. Officer Gaylord was on the driver's side of the vehicle and advised he

---

[3] A review of Kenney's criminal history indicates that, in Vermont, from 2012 through 2020, he incurred multiple misdemeanor convictions, including for operating a vehicle with a suspended license, domestic assault, heroin possession, simple assault, retail theft, and violation of conditions.

observed metal picks (commonly used to clean pipes) and a prescription bottle with clear liquid in it. Sergeant Moulton advised Tomasi and Kenney that he was going to have Officer Gaylord use his narcotics detection K9 to perform an exterior sniff of the vehicle. Tomasi stated, "Go ahead."

15. Officer Gaylord and his K9, K9 Mike, performed an exterior sniff of the vehicle. Officer Gaylord advised me that K9 Mike alerted on the Pathfinder. Officer Gaylord and K9 Mike are a certified K9 team. They are certified by the Vermont Criminal Justice Training Council. They are certified in narcotics detection and as a patrol team. K9 Mike is certified in the detection of cocaine, cocaine base, heroin, methamphetamine, and ecstasy.

16. After K9 Mike alerted on the Pathfinder, Sergeant Moulton advised Tomasi of the alert. Sergeant Moulton asked Tomasi to step out of the vehicle and to speak to him. Tomasi got out of the vehicle from the driver's side. Sergeant Moulton asked Tomasi if he had any drugs on him and he advised that he did not. Sergeant Moulton asked Tomasi for permission to pat him down and Tomasi agreed. Sergeant Moulton then asked him to turn his pockets out and he agreed. Sergeant Moulton asked Tomasi if he had track marks (*i.e.*, needle marks on his arms). Tomasi pulled up his right sleeve and I observed marks, one of which was bleeding. Tomasi claimed it was a scratch. Sergeant Moulton then asked Kenney to get out of the vehicle. Kenney consented to a pat down and he also consented to emptying his pockets.

17. Sergeant Moulton asked Tomasi for consent to search the vehicle and Tomasi claimed it was not his. Sergeant Moulton advised him that he (Tomasi) was in constructive possession of the vehicle that he claimed he was not driving. Tomasi then called the registered owner Ricky Dailey. Tomasi spoke to Dailey by telephone and he put the phone on speaker so Sergeant Moulton could talk to him. Sergeant Moulton spoke with Dailey and advised of the

7

situation. Sergeant Moulton advised him that he was looking for consent to search the vehicle. Dailey and Tomasi spoke and Tomasi told Sergeant Moulton to search the vehicle. A signed consent to search card was obtained from Tomasi.

18. Sergeant Moulton and Officer Gaylord searched the vehicle. Officer Gaylord located a full syringe in the passenger side door pocket, which is where Kenney was sitting. Sergeant Moulton located several syringes in Tomasi's coat and located a black box on the floor behind the passenger seat (within arm's reach of Tomasi). In the black box, Sergeant Moulton located suspected heroin and cocaine.

19. I arrived on the scene and asked Sergeant Moulton if I could speak to Tomasi and Kenney. Sergeant Moulton said that would be fine. I asked Tomasi if I could speak to him. Tomasi said anything in the vehicle was not his, as he was just sitting in the vehicle. Tomasi said he did not know of any illegal narcotics in the car. I then spoke to Kenney who I know from prior law enforcement dealings. I asked Kenney if he was clean and not using narcotics. Kenney said he was trying. I told Kenney he was not under arrest at that point but that I would like to know where the narcotics in the vehicle came from. Kenney told me they went to "Adam's" house around 3:00 p.m. to buy heroin and crack cocaine. Kenney said they were buying more from "Adam" who drives a black SUV and who left just prior to the police approaching their window. Kenney said the only thing in the vehicle that was his was a loaded needle of cocaine. He said no heroin was his. I then left to rejoin the surveillance team.

20. At approximately 8:00 p.m., SALDI left Shaw's and traveled back to the Subject Premises in the Subject Vehicle. SALDI parked the Subject Vehicle, he and a black male got out and walked to the back of the Subject Vehicle, and then walked inside the front door of the Subject Premises.

21. The following day, I field-tested the suspected cocaine base and heroin seized by Sergeant Moulton from the Pathfinder. The result was positive for cocaine base and for heroin. The drugs were placed into an evidence bag and prepared for delivery to the Vermont Department of Public Safety, Forensic Division for analysis.

## KNOWLEDGE AND TRAINING

22. I have been informed that controlled substance traffickers and distributors (collectively, "distributors"), commonly keep their drugs in their homes, on their property, in their motor vehicles, in their apartments, or in hotel/motel rooms where they are staying. Distributors do this for several reasons, namely: (1) to keep their drugs readily available for sale, (2) to provide security for their drugs—as they are constantly vigilant of other drug users and distributors who would steal their products, and (3) to help keep their activities clandestine—as their trade is illegal and they are constantly aware of law enforcement efforts to discover their activity.

23. Distributors commonly keep their drugs on their persons to prevent them from being stolen, and to avoid detection by law enforcement. It is common for distributors to keep the drugs concealed within their pockets, hidden compartments within their clothing, and within their undergarments (underwear, bra, etc.)

24. Distributors commonly maintain on hand large amounts of cash in order to finance their on-going business. The courts have recognized that unexplained wealth is probative evidence of crimes including illegal distribution of controlled substances. Distributors often have large amounts of currency on hand. Selling illegal drugs and purchasing illegal drugs is typically a cash-only business.

25. Distributors commonly maintain addresses and telephone numbers in books or ledgers, which reflect the names, addresses, and telephone numbers of their drug associates.

26. It is common for distributors to conceal contraband, proceeds of drug sales, and records pertaining to their drug manufacture and drug transactions in secure locations within their residences, apartments, and hotel/motel rooms for ready access.

27. Further, based on my training and experience, I know that persons who participate in the distribution of controlled substances frequently use cellular telephones ("smartphones"), among other devices, to coordinate their unlawful activities and to maintain contact with suppliers and consumers of illegal narcotics. In addition, I know that information stored on smartphones can constitute evidence of drug distribution. Among other things, the evidence may contain the telephone numbers assigned to the communication devices, the existence or content of messages received by or sent from the devices, identification numbers and other information contained in their electronic memories, and the records of telephone numbers to which calls were placed and from which calls were received. Further, drug distributors often use their smartphones to take photographs of controlled substances, other members of their organizations, assets obtained from profits of drug sales, locations associated with their illegal activity, and other useful evidence. Finally, data contained in a smartphone or other electronic device may reveal the physical location of the device at various times. For example, the latitude and longitude of the camera at the time it takes a photograph will be contained in the metadata associated with the picture. In addition, if a device has Global Positioning System (GPS) capabilities, additional information regarding locations of the device, while it follows GPS directions, may be recovered from the device. In addition, drug distributors use these devices to communicate about drug sales through text messaging and social media sites such as Facebook, Twitter, Instagram and others.

28. Distributors usually keep paraphernalia, including scales, cutting agents, packaging materials, and instruments for consumption at the locations where those activities take place.

29. Distributors often keep firearms including handguns, ammunition, and other weapons in their residences to safeguard supplies of drugs and fruits of dealing in controlled substances.

30. Distributors who have amassed proceeds from the sales of drugs will often attempt to legitimize these profits. In this process, drug distributors often utilize, among other things: (1) banks and their attendants, (2) ATM machines, (3) services, (4) securities, (5) cashier's checks, (6) money drafts, (6) real estate, (7) shell corporations, and (8) business funds. Records evidencing such services and transactions are maintained where the distributors have ready access to them.

31. Distributors often speak with others, in person and over the telephone, including their smartphones, regarding the acquisition and delivery or distribution of drugs.

32. Drug distributors use motor vehicles as a tool to conduct their businesses. Drug distributors use their vehicles, as well as vehicles that belong to others, to both transport and store drugs. Drug distributors will oftentimes store such things as drugs, cash, drug records, customer lists, and paraphernalia within their vehicles.

33. Distributors usually keep paraphernalia including scales, cutting agents, packaging materials and instruments for consumption at the locations where those activities take place, including within their residences, vehicles, and other real property.

34. Distributors frequently take or cause to be taken, photographs of themselves, their associates, their property, and their drugs and/or money. Distributors usually maintain these

photographs in their residences, vehicle, and other real property and/or on their electronic devices (including cell phones) and social media accounts such as Facebook, Twitter, Snapchat, etc.

35. Distributors often keep firearms including handguns, ammunition, and other weapons in their residences, vehicles, in other real property, and on their persons to safeguard supplies of drugs and fruits of dealing and using controlled substances.

## CONCLUSION

36. I respectfully submit that this affidavit supports probable cause for a search warrant authorizing a search of the Subject Premises described in Attachment A-1 to seek the information described in Attachment B-1 and for a search warrant authorizing the search of the Subject Vehicle described in Attachment A-2 to seek the information described in Attachment B-2.

Respectfully submitted,

_____
Task Force Officer Wade Cochran
Federal Bureau of Investigation

Subscribed and sworn to before me on March 23rd, 2020.

_____
Hon. John M. Conroy
United States Magistrate Judge
District of Vermont